COLLECTIVE BARGAINING AGREEMENT

BETWEEN

LOCAL 713, INTERNATIONAL BROTHERHOOD OF TRADE

UNIONS, U.M.D. I.L.A., A.F.L.-C.I.O.

UNION

AND

VIP CONCIERGE, INC.

EMPLOYER

June 1, 2017 – May 31, 2020

## TABLE OF CONTENTS

ARTICLE

1.  RECOGNITION OF UNION STATUS................................................................1
2.  UNION SECURITY.........................................................................................1
3.  MONTHLY CHECK-OFF................................................................................2
4.  HOURS OF WORK AND OVERTIME...........................................................3
5.  PART-TIME EMPLOYEES ............................................................................3
6.  WAGES AND COMPENSATION ...................................................................3
7.  PRIOR CONDITIONS ....................................................................................3
8.  DISCHARGES .................................................................................................3
9.  JOB SECURITY AND SEVERANCE PAY ...................................................4
10. VISITATION OF UNION DELEGATE...........................................................4
11. VACATIONS....................................................................................................4
12. HOLIDAYS ......................................................................................................5
13. SICKNESS BENEFITS ...................................................................................6
14. DEATH IN THE FAMILY ..............................................................................8
15. JURY DUTY.....................................................................................................8
16. EXAMINATION OF RECORDS ....................................................................8
17. INDIVIDUAL AGREEMENTS ......................................................................9
18. LATENESS AND ABSENTEEISM ...............................................................9
19. GRIEVANCE AND ARBITRATION .............................................................9
20. RIGHTS OF MANAGEMENT.......................................................................12
21. DRUG & ALCOHOL TESTING....................................................................13
22. TERMINATION OF THE EMPLOYER'S CONTRACT WITH THE BUILDINGS .......14
23. HEALTH AND WELFARE FUNDS ..............................................................15
24. NO DISCRIMINATION..................................................................................19
25. NO STRIKE/NO LOCKOUT .........................................................................19
26. SAVINGS CLAUSE ........................................................................................19
27. EXPIRATION DATE .......................................................................................20

SCHEDULE A ...........................................................................................................2

i

761706-4

AGREEMENT made as of this 1st day of June, 2017 between Local 713, International Brotherhood of Trade Unions, U.M.D. I.L.A., A.F.L.-C.I.O., hereinafter called the "Union," and VIP Concierge, Inc., hereinafter called the "Employer," where it is mutually agreed as follows:

1.   RECOGNITION OF UNION STATUS

A.   The Employer hereby recognizes the Union as the exclusive bargaining agent for full-time doormen, concierge employees and guards working at 525 Clinton Avenue, Brooklyn, New York (collectively "Building(s)"), but excluding at those locations executives, office clericals, and supervisors as defined by the National Labor Relations Act ("Unit").

B.   A "full-time" employee as covered by this Agreement is defined as an employee who regularly works more than thirty-five (35) hours per week. A "part-time" employee as covered by this Agreement is defined as an employee who regularly works more than twenty (20) hours but less than thirty-five (35) hours per week and is regularly scheduled to work. Employees who work less than twenty (20) hours per week shall not be entitled to any benefits pursuant to this Agreement. Employees who regularly work less than twenty (20) hours per week are not Unit employees and are not covered by this Agreement.

2.   UNION SECURITY

A.   As a condition of employment, employees of the Employer, covered by this *Agreement* shall, on or after the 30th day following the beginning of employment, the effective date of this *Agreement*, or the execution date of this *Agreement*, whichever is later, become members of the Union, but only to the extent that such membership requires that the employee pay either (i) if a member, the Union's initiation fees and periodic dues uniformly required, or, (ii) if a non-member, service fees, which in the case of a regular service fee payers shall be equal to the Union's initiation fees and periodic dues, or in the case of an objecting service fee payer, shall be the

1

761706-4

proportion of the initiation fees and dues uniformly required, corresponding to the proportion of the Union's total expenditures that supports representational activities and costs.

B.    In the event an employee covered by this Agreement is declared by the Union not to be in compliance with this Union Security provision, as required, the Union shall notify the Employer in writing of such fact, and the parties shall have ten (10) business days time to adjust the matter. Should the matter not be adjusted within the allotted time, then the employee in question shall be forthwith discharged from the employ of the Employer.

C.    The Union agrees that membership in the organization shall be and shall remain available to all employees of the Employer on the same terms and conditions generally applicable to other Union members.

D.    The facility shop steward shall be notified by the Employer when a new employee is hired.

E.    Employees shall be deemed for the first four (4) months of their employment to be probationary employees. After the probationary period, an employee can only be dismissed or laid-off in accordance with this *Agreement*. Probationary employees who are discharged shall not be subject to the grievance and arbitration provisions of this *Agreement*.

3.    <u>MONTHLY CHECK-OFF</u>

Upon individual written authorization, the Employer shall deduct and send to the Union on or before the tenth (10th) day of each month from the wages of each employee the monthly union dues, initiation fees and assessments and shall make the necessary remittances on forms to be supplied by the Union. Any failure to comply with the provisions of this paragraph shall make the Employer personally liable therefor.

2

761706-4

4.    HOURS OF WORK AND OVERTIME

A.    Each employee shall be entitled to one (1) full day of rest per week, which shall be twenty-four (24) consecutive hours.

B.    All work performed in excess of forty (40) hours per week shall be paid one and one-half times the straight hourly wage.

5.    PART-TIME EMPLOYEES

Employees who work more than twenty (20) and less than thirty-five (35) hours per week shall be classified as part-time employees under this Agreement and are Unit employees. Said employees' benefits are governed by the provisions contained herein.

6.    WAGES AND COMPENSATION

The employees shall receive wage increases as identified in Schedule "A."

7.    PRIOR CONDITIONS

All conditions and benefits which prevail in the Building(s) at the present time, or which shall prevail during the term of this *Agreement* or any extensions or modification thereof, which are more favorable than the provisions set forth herein, shall be deemed additional benefits. There shall be no reduction of wages and/or diminution of any rights, additional benefits, privileges or advantages which the employees are now receiving or which they shall receive during the term of this *Agreement* or any extension or modifications thereof.

8.    DISCHARGES

The Employer may discharge for just cause only. If the cause is challenged by the Union, then the issue is to be submitted to arbitration in the manner hereinafter provided.

3

761706-4

9.      JOB SECURITY AND SEVERANCE PAY

A.      In case of layoff due to reduction of force, the layoff shall be by seniority by classification. The Employer shall give to employees who have been employed for one (1) year at least one week's notice of layoff or, in lieu of the notice, an additional week's pay. The Employer shall recall employees on the basis of seniority by classification.

B.      In the event the Employer's contract with the Building(s), corporation or entity to provide doorman, concierge and/or guard services is terminated by either the Employer or the Building(s), corporation or entity, and the new contractor does not assume the terms of this *Agreement* in accordance with Article 21, it is understood that an employee's employment with the Employer is ended because of the discontinuation of the Employer's services as set forth herein. The employee's employment with the Employer may end, with or without notice, and the terminated employees will not be entitled to severance.

10.     VISITATION OF UNION DELEGATE

The duly authorized Union delegate shall have access to the Building(s) at all reasonable times for the purpose of investigating the labor conditions existing in the Building(s) and for the purpose of ascertaining whether the provisions of this *Agreement* are being fully complied with by the Employer.

11.     VACATIONS

A.      Every full-time employee employed with a substantial continuity at the Building(s) or by the same Employer shall receive each year a vacation with pay, as follows:

| | | |
|---|---|---|
| Employees who have worked six (6) months | - | one (1) week (five (5) days) |
| Employees who have worked one (1) year | - | two (2) weeks (ten (10) days) |
| Employees who have worked eight (8) years | - | three (3) weeks (fifteen (15) days) |

4

761706-4

B.     Employees who regularly work more than twenty (20) hours and less than thirty-five (35) hours per week shall after six (6) months of employment receive three (3) paid vacation days, after one (1) year of employment shall receive six (6) paid vacation days, and after eight (8) years of employment shall receive nine (9) paid vacation days. All paid vacation days for part-time employees will be proportioned to their hours worked during the work week. Part-time employees' vacation is payable at the rate of their regular weekly rate.

C.     Regular days off and holidays falling during the vacation period shall not be counted. If a holiday falls during the employee's vacation period, he shall receive an additional day's pay therefor.

D.     Vacation wages shall be paid prior to the vacation period unless otherwise requested by the employee, who is entitled to actual vacation and cannot be required to accept payment for vacation wages in lieu of actual time off.

E.     Management has the right to determine the vacation period for all employees.

F.     Any employee leaving his/her job for any reason shall be entitled to a vacation accrual allowance computed on his length of services as provided in the vacation schedule, to the date of his leaving.

12.     HOLIDAYS

A.     Employees shall be entitled to the following holidays and shall be paid the same amount they would normally receive on that day if a holiday had not occurred and they had worked: New Year's Day, President's Day, Memorial Day, Labor Day, Independence Day, Thanksgiving Day, and Christmas Day.

5

761706-4

B.      All Employees who may be called upon to work on any of the above named holidays shall be paid one and one-half times their regular rate of pay in addition to their regular day's pay.

C.      If an Employee has a day off at any time and that day should be on one of the holidays herein, the employee shall be compensated with either an extra day's pay or a day off, as may be decided by the Employer.

D.      Employees who have completed their probationary period and who regularly work more than twenty (20) hours and less than thirty-five (35) hours per week shall receive holiday pay provided they are scheduled to work the day of holiday.  In no event will an Employee working between twenty (20) and thirty-four (34) hours per week receive more than three (3) paid holidays per year.  Part-time employees shall receive their straight-time pay for holidays.  If the part-time employee works staggered hours, the paid holiday leave will be the average daily rate for said employee.

13.    <u>SICKNESS BENEFITS</u>

A.      Employer complies with the New York City's Earned Sick Time Act, as amended ("ESTA").  All Employees who work at least eighty (80) hours in a calendar year are entitled to paid sick leave in that calendar year.   In each calendar year, employees who work more than eighty (80) hours per calendar year for the Employer shall accrue sick leave at the rate of one (1) hour for every thirty (30) hours worked, up to a maximum of forty (40) hours of sick leave per calendar year.  All sick leave shall be based on the Employee's regular hourly rate of pay.

B.      Employees may use their earned sick time for the following purposes:

6

761706-4

- to care for themselves due to an illness, mental or physical, or for treatment of an injury or a health condition that necessitates medical or preventive care;

- to provide care for comparable issues to a family member defined as employee's child, spouse, domestic partner, parent, sibling, grandparent, grandchild or a child or a parent of employee's spouse or a domestic partner;

- when the Employer has been shut down temporarily due to a public health emergency or where Employee's child's school or childcare provider has been closed by order of a public official due to a public health emergency.

C.      At the end of the calendar year, Employees will not be reimbursed for unused sick time. However, Employees may carry over up to forty (40) hours of accrued sick time to the next calendar year. In no event will the Employer grant any employee more than forty (40) hours of paid sick time in any calendar year. Additionally, Employees will not be paid out for unused sick time upon their termination/separation of employment.

D.      All sick pay must be recorded and approved on Employee time records. Where the need for sick time is foreseeable, the Employee must notify the Employer seven (7) days prior to the date such sick time is to begin, in order to receive sick pay for time actually absent from work. Where such need is not foreseeable, the Employee must notify the Employer as soon as practicable. For absence of more than three (3) consecutive workdays, the Employer reserves the right to require documentation that the use of sick time was authorized by this Article.

E.      The Union and Employer bargained over paid sick leave benefits and expressly agree to provide sick leave benefits to Employees in accordance with ESTA. To the extent ESTA is amended during the life of this *Agreement* and ESTA, as (thereafter) amended, conflicts with

7

761706-4

the provisions of this Article, the Union and Employer agree that paid sick leave benefits shall be provided in accordance with ESTA, as (thereafter) amended.

14.    DEATH IN THE FAMILY

A.    Employees with at least one (1) year of employment at the Building(s) shall not be required to work the following number of days but shall receive their regular straight-time wages for any of such days off in which he/she was regularly scheduled to work, or entitled to holiday pay:

Three (3) days immediately following the death of his/her parent, spouse or child;
Two (2) day immediately following the death of his/her sibling or current parent-in-law;
One (1) day immediately following the death of his/her grandparent or grandchild.

B.    This benefit is not available for part-time employees.

15.    JURY DUTY

A.    Employees who are called for Jury Duty and who serve shall be paid the difference between Jury Duty pay and their regular earnings for such time as they serve as jurors. Employees who receive notice to serve on Jury must notify his employer immediately when such notice is received. This benefit will last a maximum of five (5) days and may be taken once (1) every four (4) years.

B.    No employee shall receive pay for any part of jury service that occurs during previously scheduled regular time off or when the employee is absent from work for other reasons.

C.    Part-time employees are not entitled to paid jury duty leave unless otherwise required by New York State law, in which case the Employer will comply with the applicable New York State law.

16.    EXAMINATION OF RECORDS

8

761706-4

The Union shall have the right, upon reasonable notice, to examine the payroll and records of the Employer to determine Unit employees' wages and hours worked.

17.    INDIVIDUAL AGREEMENTS

The Employer shall not enter into any individual contract or verbal agreement with any of its employees, and no agreement, understanding, alteration or variation of the terms and conditions hereof shall bind the employer or the Union, unless made and executed in writing by the Employer and the Union, and that this *Agreement* shall supersede any and all prior agreements between the Employer and any of the employees, except as to any prior better conditions that existed or prevailed prior to this *Agreement*.

18.    LATENESS AND ABSENTEEISM

A.    If an employee is late four (4) times in a calendar year, he/she will get a written warning. If that employee is late one (1) more time in the same calendar year, he/she shall be suspended for at least one (1) full day. If that employee is late one (1) more time in the same calendar year, he/she shall be discharged. The Union will be notified in writing after the Employee has incurred his fourth lateness in a calendar year.

B.    If an employee is absent five (5) days in a calendar year, not counting the sick days he is entitled to, he/she will get a written warning. If that employee is absent one (1) more day in the same calendar year, he/she shall be suspended for at least one (1) full day. If that employee is absent one (1) further day in the same calendar year, he/she shall be discharged. This does not abridge an employee's rights – if any – under the federal Family and Medical Leave Act.

19.    GRIEVANCE AND ARBITRATION

9

761706-4

A.      All grievances concerning discipline and termination between the parties hereto (the Employer and the Union), growing out of the interpretation or application of any clause of the *Agreement*, or any breach or threatened breach of the Agreement, shall be settled in the following manner:

1.      Any said dispute or grievance shall be presented to the Employer in writing within five (5) calendar days of its occurrence.  The Employer is obligated to notify the Union of all discharges within five (5) calendar days of said discharge.

2.      If the dispute or grievance is not adjudicated or resolved, either party may submit the matter to arbitration within forty-five (45) days after the occurrence of the act giving rise to the arbitration.  Contract arbitrators for this *Agreement* shall be Elliot Shriftman and Roger Maher to be selected in the order presented above, or in any order selected by the parties.

3.      Grievances that occur on a repeated basis and/or concern an employee's compensation may be filed during the term of the *Collective Bargaining Agreement*.  Grievances concerning the scope and extent of the management rights clause shall fall under this section. However, said grievance may not seek any damages prior to the beginning of the *Collective Bargaining Agreement* in which the instant grievance was filed.  The payment of a bonus or any income not required by the instant *Collective Bargaining Agreement* shall not be considered to have occurred on a repeated basis.  All other time limitations contained in paragraph A shall remain the same and apply to all grievances, regardless of their nature.

B.      The failure of either party to submit an arbitratable dispute to arbitration within the time limit proscribed within this Article shall be conclusively deemed to be a waiver of its rights thereto, and of the claim upon which it is based.  No individual employee may initiate an

761706-4

arbitration/proceeding, it being agreed and understood that the Employer and the Union are the only parties at interest herein.

C.      If the Arbitrator finds that an employee has been unjustly discharged, he shall be reinstated to his former position without loss of seniority or rank and without reduction of salary. The Arbitrator may also award, as a remedy, reinstatement of the employee without back-pay.

D.      If either party defaults in appearing before the Arbitrator, after having been given due written notice, the Arbitrator may render an award upon the testimony of the party appearing.

E.      Arbitration expenses shall be borne equally by the parties.

F.      Discharge arbitrations shall take precedence over all other arbitrations. The parties shall cooperate to proceed without delay to complete the hearing on discharge cases.

G.      Any party may initiate an arbitration proceeding.

H.      The procedure herein outlined in respect to matters over which the Arbitrator has jurisdiction shall be the sole and exclusive method for the determination of all such issues. The Arbitrator shall have the power to award appropriate remedies. The award of the Arbitrator is final and binding upon the parties and the employee or employees involved, provided, however, that nothing herein shall be construed to forbid either party from resorting to court for relief from or enforcement of the arbitration award.

I.      In a proceeding to confirm an arbitration award, the party moving to confirm the award may serve the other party by registered or certified mail.

J.      The Arbitrator shall have no power to vary from, alter, modify, amend or in any way change the *Collective Bargaining Agreement* in arriving at a decision. The decision of the Arbitrator shall be final and binding upon the parties.

11

761706-4

K.      It is expressly understood that an Employee's failure to report to work on time may and/or will eventually lead to the Employer imposing disciplinary action, up to and including discharge.

L.      All timing and/or filing obligations as set forth in this section or instant *Agreement* are conditions precedent to participate in the arbitration process and procedures as set forth herein. A court of competent jurisdiction may determine if either party has satisfied the jurisdictional requirements set forth herein.

20.     RIGHTS OF MANAGEMENT

A.      The Employer retains the exclusive right to manage the business, to direct, control and schedule its operations and work force and to make any and all decisions affecting the business, whether or not specifically mentioned herein and whether or not heretofore exercised. Such prerogatives shall include, but are not be limited to, the sole and exclusive rights to: demote, suspend, discharge and discipline employees, with just cause, and hire, promote, lay off, assign, transfer, select and determine the number of its employees, including the number assigned to any particular work; to increase or decrease that number; direct and schedule the work force; determine the location and type of operation; determine, assign, reduce and/or schedule when overtime shall be worked; install or remove equipment; discontinue the operation of the business by sale or otherwise, in whole or in part at any time; determine the methods, procedures, materials and operations to be utilized or to discontinue their performance by employees of the Employer; transfer or relocate any or all of the operations by sale or otherwise, in whole or in part, at any time; determine the work duties of employees; subject to past practice, promulgate, post and enforce rules and regulations governing the conduct and acts of employees during working hours; require that assigned duties other than those normally assigned be performed; select supervisory

12

761706-4

employees; train employees; conduct drug and alcohol testing, discontinue or recognize or combine any department or branch of operation with any consequent reduction or other change in the work force; introduce new or improved methods or facilities, regardless of whether or not the same cause a reduction in the working force; determine job qualifications, work pace, work performance levels, standards of performance, and methods of evaluation of the employees and in all respects carry out, in addition, the ordinary and customary functions of management, all without hindrance or interference by the Union provided the aforementioned rights do not conflict with the terms of this *Agreement.*

B.      The provisions of this *Agreement* do not prohibit the company from directing any person not covered by this *Agreement* from performing any task.  The Employer, therefore, has the right to schedule its management and supervisory personnel at any time, provided they do not perform bargaining unit work.

21.     DRUG & ALCOHOL TESTING

A.      If it is determined by a certified testing laboratory that any employee has reported to work or has been at work "under the influence" of alcohol three (3) or more times within a three (3) year period it is hereby agreed between the Employer and the Union that said Employee has engaged in a willful or substantial violation of the obligation(s) of his employment and may be discharged for cause.  It is further agreed that said employee will be ineligible for severance of *any* kind and that the only defense to said discharge that the Union may raise in an arbitration proceeding is a defense related to the "chain of custody."  Nothing in this paragraph shall be interpreted as limiting Employer's "management rights" in any manner or limiting management from taking any immediate disciplinary action, as it sees fit, subject to the other provisions of this *Agreement.*  "Under the influence" shall be defined and interpreted in a liberal fashion,  In other

13

761706-4

words it is understood Employees are not permitted to either report to work under the influence of alcohol or drink any alcohol beverages during the work day.

B.      If it is determined by a certified testing laboratory that any Employee has reported to work or has been at work under the influence of an unlawful controlled substance it is hereby agreed between Employer and the Union that said Employee has engaged in a willful or substantial violation of the obligation(s) of his employment and may be discharged for cause.  It is further agreed that said employee will be ineligible for severance of *any* kind and that the only defense to said discharge that the Union may raise in an arbitration proceeding is a defense related to the "chain of custody."  Nothing in this paragraph shall be interpreted as limiting the Employer's "management rights" in any manner or limiting management from taking any immediate disciplinary action, as it sees fit, subject to the other provisions of this *Agreement*.

C.      A refusal to take a "drug" or "alcohol" test will be determined and interpreted as if the Employee had taken and failed same.

22.     <u>TERMINATION OF THE EMPLOYER'S CONTRACT WITH THE BUILDINGS</u>

A.      In the event that the Employer's contract to provide doorman, concierge and guard services to the Building(s), corporation or entity is terminated and another individual, partnership and/or corporation replaces the Employer in which he, she, they, it or any person associated with them in their business or by family relationship do not have an interest, to perform doorman, concierge and guard services to the Building(s), corporation or entity, the Employer shall be relieved of any responsibilities under the terms and conditions of this *Agreement*.

B.      The Union expressly agrees the Employer may terminate its contract to provide doorman, concierge and guard services to the Building(s), corporation or entity without requiring the new contractor to assume the terms of this *Agreement*.  The Employer shall not be obligated to

14

761706-4

the Union and the employees for any damages or loss sustained by reason of the new contractor or its failure to assume the terms of this *Agreement.*

      C.      The Employer hereby agrees to immediately notify the Union by certified mail, return receipt requested, if reasonable and possible, thirty (30) days prior to any contract termination with the Building(s) and shall furnish therein the date thereof.

23.     HEALTH AND WELFARE FUNDS

      The Employer's obligations in connection with health benefits shall be as follows:

      1.      It is understood the Employer will: 1) only have to make contributions to unit employees who have elected health benefits in accordance with the terms and conditions as set forth herein; 2) only have to make contributions on behalf of unit employees for those unit employees who have elected coverage and who average more than thirty (30) hours of work per week during the applicable "measurement period" as such term is defined by the Affordable Care Act ("Act"); 3) not have to make contributions to any "seasonal" or "variable hour" employees as those terms are currently defined by the Act until such time as required by the Act; 4) not be required to make welfare contributions on behalf of any electing unit employee who is no longer automatically entitled to health benefits under the Act because of the unit employee's "break in service" with the Employer, as those terms are defined by the Act; and 5) not have to alter a unit employee's part-time status -- and therefore make contributions to the welfare fund on behalf of such electing unit employees -- until the beginning of the new plan year. It is understood each of the foregoing provisions are severable and must be satisfied - to the extent they are applicable - for the Employer to have an obligation to contribute to the Welfare Fund on behalf of a unit employee.

761706-4

2.      All full time employees, as defined by the Act as it currently exists or may be amended, shall be eligible to participate in the I.B.O.T.U. Bronze Renaissance Plan.   Such program shall provide not less than a "bronze" level of benefits as defined by the Act. Notwithstanding anything contained herein, it is acknowledged and agreed the Employer will have *no obligation, whatsoever*, to make *any* contribution to the I.B.O.T.U. Health and Welfare Fund ("Fund") in connection with employees who have executed the "Waiver of Election" form annexed hereto as Addendum "A." It is also agreed Unit employees *who do not execute* the "Waiver of Election" form annexed hereto as Addendum "A," will contribute no more than nine and one-half percent (9½%) of their "Form W-2" wages per month for single coverage only.  The Employer will be responsible for the balance of the contributions for said single coverage at the applicable rate for each year of the *Agreement*.  Employees who wish to elect and receive any coverage other than single coverage will be responsible to pay the difference between the Employer's cost for single coverage and the cost of family coverage.

3.      The Employer agrees to pay the sum of:

| Effective Date | Single | Family |
| --- | --- | --- |
| November 1, 2016 | $395.00 | $1,065.00 |
| November 1, 2017 | $420.00 | $1,135.00 |
| November 1, 2018 | $445.00 | $1,200.00 |
| November 1, 2019 | $470.00 | $1,270.00 |

Payments to the Fund shall be due on or by the 1st day of every month after the month in which the employee receives coverage; here payments shall commence on December 1, 2016.  The Employer shall also be required to make such payment to any other insurance provider as may be designed by the Union and the Fund in writing, in place of the aforementioned Fund, provided the

16

761706-4

Employer's cost of health and welfare contributions as set forth in this Article does not increase as a result of said designation.

1.      The Employer shall be required to begin contributions for new employees who have completed their probationary period by the 10th day of any month.

2.      The Welfare Fund has been created and maintained pursuant to an Agreement and Declaration of Trust ("Trust"). Said Trust is hereby made a part of this Agreement with the same force and effect as if fully incorporated herein. The Employer and Union hereby agree that upon the execution of this Agreement they shall be deemed parties to the Trust.

3.      Failure of the Employer to make prompt contributions, when due, to the Fund shall authorize the Fund to take immediate action, including requesting the Union to strike, against the Employer. In such event, the Union shall have the right to strike without recourse to the arbitration procedure, and any other provisions of this *Agreement*.

4.      In the event, the Union and the Fund decide to discontinue the provisions of hospital/Welfare benefits to eligible bargaining unit employees and/or their eligible dependents, it shall notify the employer in writing and thereafter the Employer shall not be required to make any further contributions for such employees for hospital/medical benefits, until such time as the Union and the Fund shall inform the Employer in writing, of the name of a substitute hospital/medical service provider, to whom the Employer contributions are to be made, provided the Employer's cost of health and welfare contributions as set forth in this Article does not increase as a result of said substitution.

5.      If the Employer is ten (10) or more days delinquent in its obligation to make contributions under this Article, the Union may serve notice of delinquency upon the Employer via certified mail stating that all coverage and benefits for the Employer's employees under the

17

761706-4

I.B.O.T.U. Health and Welfare Fund will be suspended unless the delinquency is cured within ten (10) days from the date of notice. If the delinquency is not cured within the time set forth in the notice, the Union may direct the Fund to suspend benefits and coverage for the Employer's employees. The rights granted under this section are accumulative and do not relieve the Employer of its obligation to make contributions or waive any other rights of the Union or the Fund.

6.     The Employer shall pay all costs and reasonable legal fees incurred or to be incurred in ascertaining and collecting any delinquent payments due to the Fund.

7.     The Employer further agrees to notify in writing, the Fund of all new employees, covered by this *Agreement*, employed for a period of thirty-one (31) days or more, and submit payments to the Fund, as described herein on their behalf.

8.     The Employer agrees that it shall be incumbent upon the Employer to advise the Union and the Fund of any change of status of any employee in its employ who receives benefits under this Article after the Employer's receipt of the monthly remittance reports from the Fund and by modifying said remittance reports accordingly. In the event that the Employer fails to notify the Union and the Fund of any lay-off, discharge or termination, for any reason, of the aforesaid employee, the Employer shall be liable to the Fund for all regular premium payments until such notice is rendered in writing by the Employer.

9.     When an Employer is four (4) or more months in arrears in contributions into the Welfare Fund, the Employer shall make those contributions, and in addition, the Employer shall deposit a sum equal to six (6) months of contributions (Based on the number of employees for whom contributions were due in the month preceding the demand for that deposit) into the Welfare Fund Savings Account. The sum shall remain on deposit during the lifetime of this agreement. The interest thereon shall accrue to the Welfare Fund and the principal shall be applied

18

761706-4

against any further Employer delinquency that might occur during the term of agreement. If any further delinquency does arise during the term of this agreement, the Employer shall be required to satisfy it and keep six (6) months of contributions on deposit of said funds shall be made within ten (10) days after notification by the Welfare Fund.

24.    NO DISCRIMINATION

There shall be no discrimination in the interviewing or hiring of applicants for employment or against employees once hired because of color, race, sex, gender, age, creed, religious belief, union membership, or any other legally protected characteristic.

25.    NO STRIKE/NO LOCKOUT

A.    During the term of this *Agreement*, the Union shall not call or authorize any strike against the Employer at the establishment and/or building(s) covered by this *Agreement* and the Employer shall not affect any lockouts. Should an employee or employees engage in any strike, and should the Employer notify the Union of such action, a Representative of the Union shall, as promptly as possible, instruct such employees to forthwith cease such action and promptly return to their respective jobs and comply with the applicable provisions of this *Agreement*.

B.    The Employer agrees that in consideration of performance by the Union as set forth above, with respect to any strike which is contrary to the provision of this section, there shall be no liability for damages on the part of the Union, its officers, agents or members for breach of contract, by suit or otherwise.

26.    SAVINGS CLAUSE

19

761706-4

If any of the provisions of this *Agreement* shall be declared or held to be a violation of any law, those provisions shall be eliminated from the *Agreement*. The *Agreement* shall remain in effect minus the deleted provisions.

27.    EXPIRATION DATE

This Agreement shall become effective as of June 1, 2017 and shall remain in full force and effect until midnight, May 31, 2020  and unless written notice of a desire for change therein or to terminate the same be given by either party, via Certified Mail, return receipt and/or facsimile transmission, at least sixty (60) days and not any more than ninety (90) days prior to the termination date hereof of desire to terminate the *Agreement*, this *Agreement* shall be automatically renewed and shall remain in full force and effect on a year to year basis thereafter.

IN WITNESS WHEREOF, the parties have hereto set their hands and seals the day above written.

VIP Concierge, Inc.                          Local 713, I.B.O.T.U., U.M.D., I.L.A., A.F.L.-C.I.O.

By: _____              By: _____

525 clinton (1)

20

761706-4

**SCHEDULE A**
**Wage Increases**

A.      Effective upon the execution of this *Agreement*, all unit employees will receive a general wage increase of One Dollar ($1.00) per hour.

B.      Effective November 1, 2017, all unit employees shall receive a general wage increase of Three percent (3%) of an employee's base hourly wage.

C.      Effective November 1, 2018, all unit employees shall receive a general wage increase of Three percent (3%) of an employee's base hourly wage.

_____
VIP Concierge, Inc.

_____
Local 713, International Brotherhood of Trade Unions, U.M.D., I.L.A., A.F.L.-C.I.O.

525 Clinton (2)

2

761706-4